UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BHAGWATI P. BANSAL, | * |
| Plaintiff, | * |
| v. | * |
| | * Civil Action No. 05-1696 (PLF) |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | * |
| Defendant. | * |

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

Plaintiff, by and through his counsel, hereby submits his opposition to Defendant WMATA's Motion for Summary Judgment. Plaintiff's Counsel submits the attached declaration pursuant to Fed. R. Civ. P. 56(f) as Plaintiff has not had the opportunity to conduct the necessary discovery to fully and adequately oppose Defendant's motion. For the reasons stated below, Plaintiff Bansal respectfully requests that Defendant's motion be denied.

STATEMENT OF FACTS

Plaintiff Bansal was hired by Defendant WMATA in 1981 as a Mechanical Engineer. While at WMATA, Plaintiff obtained his Masters in Business Administration (MBA) from Marymount University. Declaration of Bhagwati Bansal, Exhibit 2. Plaintiff also pursued training in numerous software programs and obtained various certifications including as a Microsoft Certified Trainer and a Cisco Certified Network Associate. Resume of Bhagwati Bansal, Plaintiff's Exhibit 3. Since 2001, Mr. Bansal has served as an adjunct professor at the

University of Maryland University College teaching courses in Computer Information Technology. Id.

In August 1985, Plaintiff's position as a TA-16 mechanical engineer was abolished. April 29, 1987 Memorandum from Vernon Garrett, Jr., David Cooksey and LaMar Dotter to Roy Brown re: Personnel Actions Resulting from 1985 Reorganization, Plaintiff's Exhibit 4. Plaintiff was then reassigned to a new TA-16 Project Engineer Position in the Facilities Engineering Branch in February 1986. February 3, 1986 Memo from David Cooksey to Plaintiff re: Transfer and Permanent Reassignment, Plaintiff's Exhibit 5.

On March 20, 1992, Defendant WMATA again abolished Plaintiff's position. Plaintiff was informed that unless he was reassigned to another position by May 4, 1992 he would be laid-off. March 20, 1992 correspondence from Luther Williams to Plaintiff, Plaintiff's Exhibit 6. Plaintiff was informed of his Local 2 union bumping rights as well as his ability to work with Defendant's Office of Personnel to find another position. Id. Plaintiff took advantage of all available opportunities and applied for several positions before being selected for the Capitol Program Coordinator Position. Plaintiff was not placed into this position until May 20, 1992, more than two weeks following the date he was to have been laid-off. May 20, 1992 Personnel Action Report for Bhagwati Bansal, Plaintiff's Exhibit 7.

On September 9, 1994, Plaintiff received notice that his position was yet again being abolished. Plaintiff's TA-20 Capital Program Coordinator was to be eliminated on November 7, 1994, Plaintiff's Exhibit 8. Again, Plaintiff Bansal worked with both the Local 2 union and Defendant's Office of Personnel to apply for vacant positions and despite being qualified for higher grade positions given his education, experience and training, was reassigned to the TA-16 Bus Maintenance Assistant Position. October 20, 1994 Memorandum from Leroy Bailey, Jr. to

Plaintiff re: job reassignment, Plaintiff's Exhibit 9.  Plaintiff's Personnel Action Report was not issued until November 8, 2004, the day following his supposed termination date. November 8, 1994 Personnel Action Report for Bhagwati Bansal, Plaintiff's Exhibit 10.  Of the 86 encumbered positions that were abolished only one employee separated from Defendant.  July 14, 1995 WMATA Office of Civil Rights Investigative Report of Bansal Complaint 853-96, Plaintiff's Exhibit 19.  The one employee who separated from WMATA, Eric Nelson, did so voluntarily upon receiving his RIF Notice.  January 12, 1998 Deposition of Bhagwati Bansal at 98, Plaintiff's Exhibit 20.

Each time, Plaintiff Bansal's position was abolished he had conversations with either the director of the division in which he worked, or the Director of Personnel assuring him that he would be given another position. Plaintiff's Exhibit 2, Bansal Declaration at ¶9.

On August 21, 2003, Plaintiff had triple bypass heart surgery and began recuperating at home.  October 21, 2003 Correspondence from Gary T. Brown to Bruce Heppen re: Request for Plaintiff to temporarily telecommute, Plaintiff's Exhibit 11.  Plaintiff, through his counsel, requested to telecommute temporarily during his recovery process.  Id. His position required minimal supervision and most of his work could have been performed via computer without Mr. Bansal's actual presence in the office.  Id.  Plaintiff's request, accompanied by his doctor's recommendation, was ultimately denied.  Plaintiff's Exhibit 2, Bansal Declaration at ¶5.  In January 2004, Plaintiff was diagnosed with Tuberculosis.  Id.

After performing his position successfully for nearly ten years, Defendant again notified Plaintiff of its intention to abolish his position of Bus Maintenance Assistant on November 13, 2003.  November 13, 2003 Correspondence from Katrina Wiggins to Plaintiff, Plaintiff's Exhibit 12.  Plaintiff Bansal notified Roslyn Rikard of Defendant's Office of Human Resources of his

intent to exercise his bumping rights. November 21, 2003 email from Plaintiff to Roslyn Rikard re: RIF Letter, Plaintiff's Exhibit 13.  Plaintiff applied for approximately twenty positions and was either deemed unqualified for the position or no action was taken. Report of Applications submitted by Plaintiff, Plaintiff's Exhibit 14. On January 6, 2004, Local 2 representative Thomas O'Connor wrote to Roberta Hamilton of WMATA's Office of Human Resources, identifying two positions, Rail Car Management Assistant and SMNT Management Assistant that "involve responsibilities that appear to be very similar, if not exactly the same," and requested the Mr. Bansal be placed in one of the vacant positions. Plaintiff's Exhibit 15.  The same day, Plaintiff Bansal was deemed unqualified for the SMNT Management Assistant position. Plaintiff's Exhibit 14. Not only was Plaintiff deemed unqualified for positions that were very similar if not the same, his duties were reassigned to positions of higher grades.  Plaintiff's Exhibit 22, September 2, 2003 BSMT Response to RIF Committee's Request for Additional Information. On or around January 8, 2004, Plaintiff spoke with Roslyn Rikard of WMATA's Office of Human resources who indicated to him that because no positions had been found to reassign him to, that he would be terminated on January 10, 2004. Plaintiff's Exhibit 2, Bansal Declaration at ¶14.

After Plaintiff learned that he would not be placed into another position, he was left with no recourse other than to file for retirement on January 16, 2004.  Defendant's Exhibit 1 to Motion for Summary Judgment.  Plaintiff officially retired from WMATA on February 1, 2004.  Defendant's Exhibit 2. Despite being terminated on January 10, 2004, Plaintiff's Separation Personnel Action Report on March 1, 2004 indicated that Plaintiff Bansal opted for early retirement.  Plaintiff's Exhibit 16.

On March 15, 2004, Plaintiff requested severance pay pursuant to Article VIII, Section 12(a) of the WMATA-Local 2 Collective Bargaining Agreement (CBA) and received 26 weeks

of severance on March 19, 2004. Excerpt from WMATA-Local 2 CBA July 1, 2000-June 30, 2004, Plaintiff's Exhibit 17; March 30, 2004 Memorandum from Katrina Wiggins to Plaintiff, Plaintiff's Exhibit 18.

After receiving his severance pay, Plaintiff Bansal requested that his Personnel Action Report accurately reflect the reason for his separation, namely a "Reduction in Force" and not the "early retirement" as had been originally indicated.  May 4, 2004 Correspondence from Plaintiff to Katrina Wiggins re: Personnel Action Report, Plaintiff's Exhibit 21.  No correction was ever made.

ARGUMENT

I.  STANDARDS OF REVIEW

Summary judgment is appropriate only when there are no genuine issues of material fact. See Celotex v. Catrett, 477 U.S. 317, 323 (1986) (holding that the movant must "demonstrate an absence of a genuine issue of material fact" in order to sustain a summary judgment motion); Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 247 (1986) (holding that summary judgment should only be granted when the record before the court "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law").  In evaluating summary judgment motions, the court must view all evidence in the light most favorable to the non-movant. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Zubieta, 180 F.3d 329, 338 (D.C. Cir. 1999).

Under this body of law, it is well established that summary judgment should be granted particularly "sparingly in employment discrimination cases." Hardin v. Hussmann Corp., 45 F.3d 262, 264 (8th Cir. 1995).  This cautionary precept recognize that matters of credibility and

inference relating to central factual matters, including motive and pretext, are paramount in employment discrimination cases. See, e.g., Shager v. Upjohn Co., 913 F.2d 398, 402 (7th Cir. 1990).

Confrontation and examination of witnesses plays a critical role in the decisional process; hence, inconsistent explanations for an employer's action alone can be grounds for denying a motion for summary judgment.  See e.g. Kolstad v. American Dental Assoc., 108 F.3d 1431, 1436 (D.C. Cir. 1997), *vacated and remanded on other grounds*, 527 U.S. 526 (1999).  Accord, Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) ("[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."). Id. at 147.

Here the parties have not yet had the opportunity to assess the credibility of the witnesses.  Given the lack of opportunity to examine and cross-examine witnesses and the sharply disputed facts, this case should not be dismissed summarily without the opportunity for discovery or an evidentiary hearing.

II. DISCOVERY HAS NOT OCCURRED, WHICH PROHIBITS PLAINTIFF FROM FULLY RESPONDING

Plaintiff Bansal's counsel submits with this Opposition his Declaration pursuant to Rule 56(f), (Plaintiff Exhibit 1) regarding certain discovery items which would have allowed Plaintiff to respond more fully to Defendant's motion for summary judgment.  Although counsel is able to specify certain items he believes would assist this Court in seeing the reasons to deny Defendant's motion, by its very nature he is unable to identify all of the facts that would be helpful for the Court.  In certain instances below, counsel notes where more information from Defendant's files would most likely support Plaintiff's request to deny the motion for summary judgment.

III. THE TIMING FOR FILING OF A CHARGE OF DISCRIMINATION DID NOT BEGIN WITH THE NOVEMBER 13, 2003 NOTICE OF RIF, I.E., IT WAS NOT A FINAL DECISION

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. requires that a plaintiff, prior to initiating a civil action in federal court, to pursue administrative procedures by filing a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC).  In the District of Columbia, filing of the EEOC charge must occur within 300 days "after the alleged unlawful employment practice occurs."  42 U.S.C. §2000e – 5(e); Brown v. General Services Administration, 425 U.S. 820, 832-33 (1976).  However, employees of Defendant WMATA are penalized with a shorter time of frame of 180 days in which to file their complaint with the EEOC. [1]  Defendant WMATA argues that the unlawful employment practice at issue here is the November 13, 2003 notice of a RIF.  Therefore, argues Metro, the filing by Plaintiff Bansal at the EEOC on June ?, 2004, was untimely.

Defendant Metro reliance on Delaware State College v. Ricks, 449 U.S. 250 (1980) to define the beginning of the charge filing period is misplaced.  In Ricks, the plaintiff had been denied tenure over a year before his final day of work.  The Supreme Court, based on the facts before it, found that the "termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure." Id. at 257-58.  The only alleged discrimination occurred, reasoned the Court, at the time of the tenure decision.

In contrast to the result reached in Ricks is Currier v. Radio Free Europe, 159 F.3d 1363 (D.C. Cir. 1998) where plaintiff was not deemed to be late in filing with the EEOC although it was more than 300 days since he had received the letter of termination.  The same issue of when did "the statutory clock start ticking" also focused on the inevitability of the result. Because Currier was informed by a manager of the employer that he was not yet terminated

---

[1]  All workers within the District's boundaries, except for those employed by WMATA, are afforded 300 days in which to file with the EEOC.  Washington v. WMATA (D.C. Cir. )

until an investigation had been completed, the court held that the discriminatory act, Currier's termination, "was not yet a final decision". Id. at 1336.

There is further reasoning from Currier that assists Plaintiff's position. The court pointed out that Currier was reasonable in relying on the words from a higher level manager who told him that the termination would not become final until an investigation was completed. Despite his receipt of written notification of termination, he was allowed to rely on his knowledge of what else would transpire before their termination decision was deemed final.

So too with Plaintiff here. Although the language in the notice received by Mr. Bansal certainly had an air of finality about it, his experience at WMATA with that particular wording indicates otherwise. In 1994, 127 positions were abolished, of which 86 were then encumbered. Plaintiff's Exhibit 19. Mr. Bansal was among the group of 86 people who were told that their termination would occur on a date certain, yet not a single one of those people was involuntarily terminated.[2] Even the one person who was separated was offered a position as an alternative to termination. The RIF process addressed the notice of termination for every single one of the 86 employees, even though the initial notice to them informed them that they would be terminated.

This is also the language of the union contract, which requires WMATA to review all jobs slotted for elimination and allow more senior people to retain their position by use of their bumping rights. Plaintiff Exhibit  . Without a scheme which predetermined that Mr. Bansal would be terminated, it would have been impossible for Defendant to know that termination would result from the RIF. There are simply too many positions into which Mr. Bansal could have bumped, had the RIF been run without unlawful bias at its core.

---

[2] That report generated by Defendant indicates that one person was separated, but it was an involuntary separation, as testified to by Plaintiff. Plaintiff Exhibit 20.

9

If then, Defendant's discriminatory act occurred when it targeted Plaintiff for a RIF, regardless of the rules it was committed to follow by the union CBA, the fact that it hid the bias it used at that time from Plaintiff should not inure to its favor and to the disadvantage of the person who was the subject of discriminatory animus.

In reality, it was the process of the RIF, not its notice or the commencement of the process, which resulted in the termination of Mr. Bansal. And his knowledge that he would be terminated could not possibly have been possessed by him until he was told that he qualified for no positions into which to bump. In fact, with 86 people riffed in 1994, with no voluntary terminations, Mr. Bansal had every reason to believe that with 10 more years of seniority, involuntary termination would not occur.

Thus the process began on November 13, 2003, would not have resulted in his termination but for the disingenuous decisions in January 2004 that he did not qualify for approximately twenty different positions for which his name was submitted.

IV. DEFENDANT SHOULD BE EQUITABLY ESTOPPED FROM ASSERTING THAT THE EEOC CHARGE IS UNTIMELY SINCE ITS ACTIONS IN JANUARY 2004 MISLEAD PLAINTIFF INTO BELIEVING HE WOULD NOT BE TERMINATED.

The charge filing period at issue here is not jurisdictional. Zipes v. TWA, 455 U.S. 385 (1982). Thus, equitable principles of waiver and estoppel may be applied to extend the time for filing with the EEOC. Currier v. Radio Free Europe, 159 F.3d 1363 (D.C. Cir. 1998).

Had Plaintiff Bansal been informed that the RIF process would not proceed as it had before and that the Defendant would not be fairly evaluating his applications for the available positions for which he qualified, Mr. Bansal would have known to earlier file his EEOC charge. However, Defendant intentionally fooled both Plaintiff and the union, Local 2, into believing that he would be given fair consideration for those jobs.

It may well be the position of Defendant that it did give Plaintiff a fair consideration for the positions, but that is easily disputed. First, Local 2 submitted to Defendant a memorandum indicating that it determined that Mr. Bansal's qualifications were an exact match for at least two positions which were available. It did so by comparing the qualifications for the job with the experience, training and education possessed by Mr. Bansal, finding two exact matchs. Plaintiff Exhibit   Such a determination by a neutral (the union is not a party to this action) at least puts the assessments by Defendant into a disputed state. Plaintiff's Statement of Material Facts in Dispute, No. 2.

Secondly, Defendant generated a document setting forth the position where the duties performed by Mr. Bansal would be transferred. Plaintiff's Exhibit 22. Each of the four specific duties discussed were to be transferred to a higher level grade than that held by Mr. Bansal. The list was to be comprehensive, so that all the duties of the abolished position were to be accounted for. The reasoning is simple, and one which could create for a neutral finder of fact an inference of discrimination: if all of the duties Plaintiff was performing were delegated to higher graded positions, [3] why would he not qualify for similar jobs at his grade level or <u>above</u>. Obviously, he was trusted to p[perform duties that were later given to higher graded people, yet in reviewing his qualifications he was deemed not qualified for jobs at his grade level. Was he considered for positions above those of a TA-16? [4]

Finally, when looking at the qualifications themselves which Mr. Bansal possessed, it is hard to imagine why he was not deemed qualified for clerk level jobs. The contract between Defendant and Local 2 require that he be given any available position for which he was

---

[3] Interestingly, three of the four duties were transferred to the very position that is the core of the other lawsuit Mr. Bansal currently pursues in this Court, his rejection for the Bus Maintenance Analyst position, given instead to a high school graduate.

[4] This would be another set of facts sought in discovery, but not yet available to Plaintiff.

qualified and, if that position was then encumbered, when he had more seniority than the person currently occupying the position. The intent of the CBA, to which Defendant was a party, was to maintain in its workforce the most senior qualified people, when it was necessary to reduce the work force. Here, however, using the doubtful decisions that Plaintiff was not qualified for positions which contained duties requiring no more skills than those possessed by a clerk, Defendant was able to extricate itself from the obligation to compare seniority. With his twenty-two plus years of experience at WMATA, Mr. Bansal surely would have had more seniority than some of those who held these clerk-level positions. [5]

If the factual determination is that Defendant did not provide for a fair chance of Mr. Bansal to be saved from the street by the actions of the RIF process, it does not fit within the equitable principles of federal law to allow it to benefit from its own wrongdoing. This would then be an appropriate situation to apply the equitable estoppel law recognized in <u>Currier</u> to provide Mr. Bansal the opportunities for redress that Defendant wrongly deceived him from doing in a timely fashion.

In this same vein, Mr. Bansal did not know nor could he have known that the notice of RIF he received in November 2003 would result in his termination from Defendant WMATA in January 2004.

Since Plaintiff had already survived three RIFs at Metro, and at the time of the RIF in 2003, he had ten more years of tenure and of experience at Metro and had also increased his skill level with additional training which he had not possessed during the processing of the three prior RIFs.

---

[5] Again, the inability of Plaintiff to engage in discovery precludes him from setting forth more specifics about the particular jobs for which he was deemed unqualified.

This is the same principle applied in Thomas v. Eastman Kodak Co., 183 F.3d 38, 47-55 (1st Cir. 1999), cert denied, 528 U.S. 1161 (2000). There the plaintiff had received unfairly low evaluations that she believed were motivated by discrimination. However, although she complained informally within her company, her salary had not been affected nor was she aware of any other adversity caused by the low evaluations. Some time after the charge-filing period for the evaluations ended, Ms. Thomas received notice of a layoff which included her because of the prior alleged poor performance. Although the company argued that the stale evaluations could no longer be the subject of an EEOC filing, the court disagreed. The court held that the period of limitations did not start running until the implications of the evaluations had crystallized and some apparent tangible effects of the discrimination were apparent to the plaintiff.

The court recognized that two conflicting principles were at issue: a defendant's right to be free from defending stale claims and a plaintiff's right to be able to challenge allegedly discriminatory events whose harm is not yet obvious. "The key is whether those evaluations had tangible, concrete effects at the time they were conducted." Id. at 50. The court pointed out that, although the employer may have been harmed by having to defend older events, it was actually advantaged because to rule that the evaluations were time-barred meant that employees would need to file protective charges of discrimination for non-adverse actions in fear that at some later point those actions may cause tangible harm.

To the same effect is Butler v. Owens-Brockway Plastics Products, Inc., 199 F.3d 314 (6th Cir. 1999), where the court allowed an employee to challenge points assigned to her for absences and lateness which occurred prior to the charge-filing period when the points eventually accumulated to result in her termination. When defendant argued that the

13

termination was based on events occurring before the charge-filing period began, the court disagreed. "Plaintiff's termination was the first material adverse action in this case, because it is the first action serious enough to warrant plaintiff's resort to the legal system." Id. at 317.

These decisions differ from Ricks because of a plaintiff's knowledge of the harm that would eventually be caused. Professor Ricks knew that he would most likely be terminated when his tenure was denied, but neither Ms. Thomas nor Ms. Butler knew that termination would result from an adverse evaluation or from the inappropriate assignment of points for an absence.

Here the same distinction can be drawn. From his history with Defendant, Plaintiff Bansal had little or no inkling that termination would result. Despite the language of the RIF notice, he knew that scores of people had previously been notified that they would be terminated, but none were. When he received his notice, he also knew, or believed he knew, that termination would not occur. When he learned that it would, the clock starting ticking and he filed with 180 days thereafter.

The benefit to Defendant for applying the distinction drawn by the Thomas and Butler courts with Ricks is that its procedure of issuing RIF notices to scores of employees would not result in dozens or even scores of protective EEOC claims filed because, perchance, one or two people may end up without work. Such numerous claims, which would eventually lead nowhere without an adverse action for which to complain, would still unnecessarily clog the system until the final results of WMATA's RIF are known. Acts that are apparently of small consequence could no longer be ignored is there is any chance that such an act could someday crystallize into an adverse action, despite the low probability of that occurrence.

For all of the reasons cited above, Plaintiff Bansal's charge of discrimination filed with the EEOC should be deemed timely.

V.  Mr. Bansal Did Not Submit His Request for Retirement Until January 16, 2004, Which Was After He Was Informed That He Had Been Terminated

Defendant WMATA makes one final argument, claiming that Plaintiff Bansal voluntarily retired.  Such an action, argues Defendant, precludes Plaintiff's claims that he suffered an adverse action.  There is, however, no factual basis for Defendant's argument.

Several facts should make for a quick disposition of WMATA's last attempt to avoid defending its actions.  As clear from his Declaration, after he was informed that Defendant could find no jobs for which he qualified, early in January, 2004, Plaintiff was informed that he would be terminated and January 9, 2004, was his last day at work.  As he plainly states, he would not have sought immediate payment of his pension benefits were it not for Defendant's assertion that he had been terminated.

Secondly, Defendant paid severance pay to Mr. Bansal for which he would only be entitled if he were involuntarily terminated.  There is no evidence, nor could there be, that WMATA pays its employees who voluntarily seek retirement a severance pay totally six months of salary.  It was only paid to Plaintiff because he was within the category of those entitled to severance pay, i.e., those were had been employees and wished to remain so but the exigencies of WMATA's business required their termination.

Although Plaintiff challenges the need to have terminated him and the motivation for it, Defendant maintains that the RIF it ran was done fairly and consistently with its obligations under the CBA.  It was due to the termination of Plaintiff that it paid him severance.

VI.   Conclusion

For all of the foregoing reasons, Plaintiff Bansal respectfully requests this Court to deny Defendant's motion for summary judgment in its entirely.

Respectfully submitted,

_____
Gary T. Brown,
D.C. Bar # 246314
GARY T. BROWN & ASSOCIATES, P.C.
320 Maryland Avenue, N.E.
Suite 100
Washington, D.C. 20002
(202) 393-4900
   Attorney for Plaintiff Bansal